**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| STEPHEN DEVON MILLER, | ) | Case No.: 1:12-cv-01818-LJO-SAB (HC) |
| Petitioner, | )<br>) | FINDINGS AND RECOMMENDATION |
| vs. | )<br>) | REGARDING PETITION FOR WRIT OF<br>HABEAS CORPUS |
| GREG LEWIS, Warden, | )<br>) | (ECF No. 1) |
| Respondent. | )<br>) | |
| _____ | ) | |

Petitioner is proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner is represented by George Schraer, Esq.

**I.**

**PROCEDURAL BACKGROUND**

Following a jury trial in the Kern County Superior Court, Petitioner was convicted of premeditated attempted first degree murder (Cal. Penal Code §§ 664, 187, subd. (a), 189; count one), assault with a firearm (§ 245, subd. (a)(2);  count two), and possession of a firearm by a convicted felon (§ 12021, subd. (a)(1); count three).  It was also found true as to count one that Petitioner personally discharged a firearm causing great bodily injury (§ 12022.53, subd. (d)) and personally discharged a firearm (§ 12022.53, subd. (c)); as to counts one and two it was found true that Petitioner personally used a firearm (§ 12022.5, subd. (a)),personally inflicted great bodily injury (12022.7, subd. (a)), and suffered a prior serious felony conviction (§ 667, subd. (a)); as to counts one, two, and three,

1

it was found true that Petitioner committed the crime to benefit a criminal street gang (§ 186.22, subd. (b)(1)), suffered a prior strike conviction within the meaning of the Three Strikes law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)), and served two prior prison terms (§ 667.5, subd. (b)).

Petitioner was sentenced to a total term of 61 years to life, calculated as follows: on count one, a 15-year-to-life term, doubled pursuant to the Three Strikes law; plus a 25-year-to-life enhancement under section 12022.53, subdivision (b); plus a five-year enhancement under section 667, subdivision (a); plus a one-year enhancement under section 667.5, subdivision (b); with enhancements under sections 12022.53, subdivision (c), 12022.5, subdivision (a), and 12022.7, subdivision (a) stayed. As to the remaining counts and enhancements, the terms imposed were stayed.

Petitioner filed a timely notice of appeal. On April 28, 2011, the California Court of Appeal, Fifth Appellate District affirmed the judgment.

The California Supreme Court denied review.

Petitioner filed the instant petition for writ of habeas corpus on October 3, 2012. Respondent filed an answer to the petition on March 13, 2013. Petitioner filed a traverse on April 26, 2013.

## II.

## STATEMENT OF FACTS[1]

Michael Brownbey, a member of the County Boy Crips (CBC), grew up in CBC territory in Bakersfield. He lived in what he called "Country, in Cottonwood and Planz [Roads]." He and [Petitioner] had known each other for about 20 years and they were close friends. Brownbey joined the CBC gang when he was 13 or 14 years old, and [Petitioner] joined about two years later. Brownbey's role in the gang was to sell drugs. He explained that some people in the gang sell drugs, some people shoot people, and some people just "bang," which means represent the gang by wearing colors and doing what they are needed to do. Brownbey usually hung out at places he could sell drugs, including a house on Southgate Avenue (the Southgate house) near CBC territory, where CBC members gathered.

About one month before the shooting, Brownbey loaned his 9-millimeter automatic gun to [Petitioner]. The day before the shooting, Brownbey asked [Petitioner] for his gun, but he did not give it back.

On October 12, 2006, Brownbey arrived at the Southgate house around 6:00 or 7:00 p.m. He came alone, but [Petitioner] and about six other CBC members, including Bob, [FN2] Darius

---

[1] This statement of facts is taken from the opinion of the Court of Appeal, Fifth Appellate District, dated April 28, 2011, which is presumed correct. 28 U.S.C. § 2254(e)(1).

2

Key, Dupree Jackson, Acoy Bohannon, and Tyrone Foreman, were already there.  Brownbey had invited several non-gang members.  Everyone present was African-American.  They went into the backyard to play dice on the patio under the porch light.

Brownbey and Bob got into an argument because Bob had invited [Petitioner] and his friends to come over and Brownbey did not want them there.  Brownbey and [Petitioner] had been having some disagreement and Brownbey "just didn't want no part of him being over there."  Brownbey had already told Bob he did not want anybody over, so he was angry with Bob for inviting them anyway.  When [Petitioner] heard Brownbey tell Bob that they had to leave, [Petitioner] asked, "[D]o I got to go, too?" and Brownbey said, "[Y]eah."  This started an argument between Brownbey and [Petitioner] as they stood around the dice game. [Petitioner] started talking about Brownbey's girlfriend and things that had happened in the past.  They both started "disrespecting each other" and calling each other names.  [Petitioner] accused Brownbey of letting someone "punk" him because the person had stolen his truck's speakers and amplifier and he knew who had done it. [Petitioner] called him a bitch for that. [Petitioner] also called Brownbey a fool because his girl was a "ho" who was sleeping with his homeboy.  Brownbey said his girl might be a ho, but he could get $1,000 for her right now and she would just give it to him.  The loaned gun came up and their argument intensified.  Brownbey approached [Petitioner], but he was "just talking," so Brownbey went back to the dice game.  Then [Petitioner] said something else.  Brownbey got up and said, "[Y]ou don't want to swipe me, [Petitioner]."  At that point, [Petitioner] tried to kick Brownbey's legs.  Brownbey said, "[Y]ou don't want to fight," and he walked back to the game. [Petitioner] continued to talk and told Brownbey he was going to "run [him] out of the country," which meant the gang. [Petitioner] did not have the authority to kick Brownbey out of the gang.  When [Petitioner] said that, Brownbey hit [Petitioner] in the face.  Brownbey was already mad because [Petitioner] was talking about his girl in front of all the men, but when he threatened to run him out of the hood, which meant by any means necessary, that was disrespect.  After Brownbey hit [Petitioner], they started fighting.  [Petitioner] fell and Brownbey fell on top of him, then the crowd broke it up by pulling Brownbey off [Petitioner]. [Petitioner] got up and told Brownbey, "[O]n my momma, I'm going to shoot you."  Brownbey replied, I got whistles, too," referring to guns.  Brownbey walked back to the dice game, and [Petitioner] and Bohannon left.

Darious Key told Brownbey he would take him where he needed to go, but Brownbey told him not to worry about it.  Brownbey did not think [Petitioner] was going to shoot him; he thought their relationship was "better than that."  He thought [Petitioner] loved him the way he loved [Petitioner].

Fifteen to 30 minutes later, when Brownbey was on his knees throwing the dice and looking down, he felt himself getting shot in the chest.  He looked up, saw [Petitioner's] face, and fell to the ground.  He saw a .38-caliber revolver in [Petitioner's] hand.  Everyone got up and ran; only a person named "Cadillac" stayed with Brownbey.

Officers in the vicinity arrived about 60 to 90 seconds after hearing the gunshots.  They saw several African-American men running and several cars leaving the area in a hurry.  Several of them pointed the officers to the backyard of the Southgate house.  The officers saw no White, Hispanic, or Asian males, and no females.  In the backyard, the officers found Brownbey lying

3

on the concrete patio with a gunshot wound. Another African-American male was attempting to help him. The officers rendered aid and asked Brownbey if he knew who had shot him, but Brownbey did not answer.

Brownbey remained conscious and was aware that emergency personnel were /cutting his clothes off. He told the officers he did not know who shot him because he did not want to identify [Petitioner]; he was just going to handle his business himself. He was going to look for [Petitioner] and do what [Petitioner] had done to him. He was not going to give any statement to the officers and he was not going to testify.

. . .

Brownbey had been shot in the chin, neck, and chest. He had surgery to replace the artery in his neck and he suffered a stroke while he was unconscious. When he woke up, he could not talk. He was partially paralyzed and he temporarily lost his ability to speak, read, and spell.

When Brownbey woke up, his mother was there. She asked him if [Petitioner] shot him, and Brownbey started crying and nodding his head affirmatively. When Brownbey's father visited, Brownbey also informed him that [Petitioner] shot him. Officers showed Brownbey a photographic lineup of six suspects. Brownbey chose the picture of [Petitioner] and circled it. Brownbey was clearheaded when he picked out [Petitioner] and at trial he still had no doubt in his mind that [Petitioner] shot him.

In the hospital, Brownbey had time to think about the whole scenario. He had been shot by his best friend, all his "homies" had left him to die, and he was unable to talk.

In February 2007, about four months after the shooting, Brownbey was arrested for selling cocaine and being involved in gang activity. He was facing the possibility of 19 years in prison. While he was in jail, officers visited him three times regarding the instant case. At first, Brownbey refused to testify. He was not willing to come forward and be a victim. He agreed to plead guilty to a gang enhancement, receive another strike, and go home. Later, after several more meetings, Brownbey agreed to testify. He was not offered any kind of deal regarding his criminal matters. He was offered only to be placed in the witness protection program and relocated. He was not forced in any way to testify.

Since the shooting, Brownbey had seen [Petitioner] about four times and [Petitioner] had not threatened him in any way, but they had not spoken to each other.

At the time of trial, Brownbey was no longer in the gang. He felt his life was in danger because he was testifying against a fellow gang member. Gang members view anyone who testifies as a threat and they do not like it when gang members testify against each other. Brownbey waited two years for [Petitioner] to at least come to him and show some compassion

///

///

4

or just ask forgiveness.[2]  Brownbey was hoping [Petitioner] would talk to him.  But then Brownbey heard about the bond on his head and he feared for his life and the lives of his girlfriend and daughter.  He had two strikes and could not possess a gun to protect himself.  He could not trust anyone.  So many people had turned against him.  When Brownbey once sent someone to talk to [Petitioner], requesting that he come talk to Brownbey, [Petitioner] responded that they would "hold court on the streets," which meant on the site.  He took it to mean that [Petitioner] would shoot him again when he saw him.

When Brownbey was in Lerdo jail, he saw Billy Johnson, a former neighbor.  Johnson asked Brownbey what had happened and Brownbey described the shooting to him.

On May 18, 2009, officers interviewed Johnson.  In the recorded interview, Johnson said he had seen Brownbey at Lerdo jail.  Brownbey told him [Petitioner] had shot him over a dice game.  When Johnson saw [Petitioner] a few weeks later, Johnson asked him, "[M]an, why you shoot–shoot [Brownbey] like that" [Petitioner] answered, "I don't–man.  You think it was hard, you know."  Johnson told the officers that he would not testify.

Johnson did testify at trial, but he did so against his will and he essentially could not remember anything.

Dupree Jackson testified that he was a former CBC member.  He left the gang in 2007, after about 10 years.  He had lived in a known gang drug house, and [Petitioner] used to come to Jackson's home to sell drugs.  Jackson joined the CBC gang when he was about 12 years old.  He wanted to be in the gang because he saw everyone else selling drugs and having money and fancy cars.  At first, he liked being in the gang because he got attention and love from his homies.  Even though Jackson had family in the gang, he still chose to get "jumped in," which meant physically hit, because he wanted to enhance his reputation.  Jackson explained that reputation and respect are very important in the gang.  Respect "[g]ets you a long way inside the gang, and you get people who, like, tell you, oh, he ain't no punk.  He got heart."  Respect helps a member's status within the gang.  OG's are older guys who have a reputation and "stripes."  They have been in the gang a long time and they are getting older.  They lead the gang and run the neighborhood.  They tell the other gang members what to do and pass on the history of the gang.  They teach the younger members "how to bang the hood and do it with respect and ride for your dead homies who died for the hood."  "[B]anging means hanging out, selling drugs, riding, and shooting your enemies.  The OG's teach the younger members the gangster code, the policy the gang members live by.  That code states that if one gang member turns evidence against a fellow gang member, he will be labeled for life as a "snitch."

Jackson explained that being an active CBC member means "basically you out there putting it down.  You got your hands in everything.  You're being aggressive.  It's, like, no limit to what you do.  You always in the middle of some type of confrontation or argument.  You just want to be the center of attention.  [Y]ou want your reputation to sky rocket....  You want to be

---

[2] The prosecution of this case was delayed for more than two years by Brownbey's refusal to testify.  The prosecution originally filed charges against [Petitioner] shortly after the shooting, but dismissed the complaint because Brownbey refused to testify.  When Brownbey agreed to testify, the prosecution refiled charges on November 21, 2008.

known throughout the whole hood.  You want that name for yourself.  Nothing matters.  You are fearless.  Not afraid to kill, shoot people. Nothing."

Jackson said that inside the gang, some people sell drugs ("hustle") all day, some just want to go shoot at the enemies ("put it down"), some drive around the boundary to protect the gang territory, and some (the "pretty boys") bring the females in the neighborhood to the gang.  Sometimes the older members pressure everyone else to be a shooter and killer.  They want everyone to "go ride for the hood."  When a member disobeys, a couple of members are sent to beat him up and discipline him.  He will be given the choice of complying or being "run ... out of the hood," which means his life will be threatened.  He will be killed if he remains in the neighborhood.  He can never return.  Being run out of the hood is a very serious thing.

The CBC color is powder blue.  Some CBC tattoos include "CBC," "NC" (the University of North Carolina log, which is used to mean "Notorious Country"), "C Dub" for (Cottonwood Road), "South Side," and "ESK" (for East Side Killer; East Side is the rival of CBC).  Gang members get tattoos after they have been to jail or have "already lied down."  It makes them look tougher and raises their status somewhat.

Jackson said that Southgate house was a CBC hangout, even though it was not in CBC territory.  The CBC gang would sell drugs from the Southgate house and keep guns there.

Jackson considered Brownbey one of his "older homies from the Country." [Petitioner] and Brownbey were friends of Jackson's older brother and Jackson had grown up around them.  Jackson and [Petitioner] hung out together every time [Petitioner] got released from prison.

Jackson was at the Southgate house during the shooting.  He had just gotten out of prison several days earlier for possession of cocaine for sale, which was his only felony conviction.  He and Key arrived in the afternoon, when four or five people were already there.  The CBC members present that evening included [Petitioner], Brownbey, Jackson, Key, Collins, and Foreman.

During the dice game, [Petitioner] and Brownbey started arguing about a gun and their girlfriends.  The argument was getting personal. [Petitioner] said, "I run this out here."  Brownbey responded, "I got the same stripes as you, you know.... You just come in the gang in the '90s.'" [Petitioner] said, "I'll run you out of the hood."  Brownbey took offense and said, "You can't run me out my own hood.  It's my hood, too.  I got stripes just like you got stripes."  At that point, they started fighting physically.  Brownbey was the aggressor and he was getting the best of [Petitioner].  When they stopped fighting, they "still started talking crap to each other." [Petitioner] told Brownbey, "You better not be here when I get back."  Brownbey answered, "I ain't trippin'.  He ain't the only one with a whistle."

After [Petitioner] left, Jackson and the others told Brownbey he should leave and they would take him anywhere he wanted to go.  But Brownbey said, "Man.... I am not trippin' .... He ain't the only one that got ... a whistle....  Nobody going to run me from my own spot.  This is my spot."  After about 10 minutes, [Petitioner] returned.  He opened the gate and walked toward them with a black revolver pointed at the ground.  He was wearing dark jeans and a dark hooded top.  Jackson stared at [Petitioner] in shock and disbelief.  Jackson got a good

6

look at [Petitioner's] face.  Jackson did nothing because he did not want to get shot.  Brownbey was standing up, counting his winnings. [Petitioner] walked quickly, as though he had a one-track mind and knew what he was going to do. [Petitioner] approached Brownbey, raised his gun, and started firing from about four to five feet away.  He fired two or three times, hitting Brownbey in the chin and neck.  Brownbey fell to the concrete and all his money scattered. [Petitioner] turned around and left the way he had come.

At this point, panic broke out.  Jackson was on parole and he had just witnessed "one of [his] homies getting shot by the next homey."  Jackson told Key, "Get me up out of here."  Foreman was not on parole, so he volunteered to call the ambulance and stay with Brownbey.  Everyone else left.

A few days later, [Petitioner] told Jackson, "Don't be putting my name," and "Don't be saying what you saw." [Petitioner] said he was on the run from parole.  He said he was going to turn himself in to parole and see what happened.

Jackson testified that [Petitioner] was not an OG in the gang, but he was a shot caller or ring leader.  Jackson felt he was in danger by testifying because there is one thing a gang member is not supposed to do and that is snitch on one of his homies.  The snitch will be killed.
The parties stipulated that [Petitioner] was a convicted felon.

**Gang Evidence**

An officer had seen [Petitioner's] tattoos about four years earlier.  On March 19, 2001, the officer was called to the Hollywood Market on Planz Road and Shellmacher Avenue.  When he arrived, [Petitioner] was in a vehicle with someone named Foreman.  The officer observed that [Petitioner] had tattoos on his face, above and below the left eye.  Above the eye was "CBC" and below was "ESK."

On September 16, 2005, at about 10:00 p.m., an officer was called out to the D & A market on Cottonwood Road, as he had been many times.  The market had "No Loitering" signs posted. When he arrived, he found over 20 vehicles and more than 50 people in the parking lot. Officers detained [Petitioner], who was wearing tennis shoes with powder blue coloring, the color of the CBC gang.  Two or three other people in the lot were wearing the same shoes. [Petitioner] had a "CBC" tattoo on his chest, a "C" on one arm, and a "W" on the other.

Officer Brent Stratton, the gang expert, described the boundaries of the CBC territory, the area the members consider home and feel safe in, but he also noted that members frequently leave the gang territory for various purposes.  The Southgate house, which is one to one and one-half miles outside the CBC territory, is in a territory not claimed by any gang and thus gangs in nearby territories might be found there.  Within their territory, gang members tag property with their graffiti to advertise their presence and their ownership of the neighborhood.  Tattoos, which show dedication, are extremely important to the gang.  When they are on body parts that are not covered by clothing, they show even greater dedication.

///

7

Officer Stratton identified some CBC members.  He testified that Darius Key, known as "D-Key," was an admitted member who had been arrested for CBC-related crimes; in Officer Stratton's opinion, Darius was a CBC member.  Bobby Collins, known as "Little Bob," had been contacted in CBC territory and arrest for CBC-related crimes; in Officer Stratton's opinion, he was a CBC member.  Officer Stratton identified four other people he considered CBC members.

Officer Stratton testified that the CBC gang's primary activities, which he had personally investigated, include murder, assault with a deadly weapon, possession of firearms, witness intimidation, criminal threats, burglary, carjacking, and sale of narcotics.

Officer Stratton presented evidence of four predicate, gang-related crimes committed by CBC members, to show the ongoing pattern of criminal activity by the CBC gang.

Officer Stratton was familiar with [Petitioner].  His moniker was "Little V."  The officer presented photographs of [Petitioner's] tattoos, which included "CBC" above his left eye to show that he was a CBC member, and "ESK" below his left eye to show he would kill his rival East Siders.  In Officer Stratton's opinion, these facial tattoos were significant because they could not be concealed by clothing.  The "CBC" tattoo on [Petitioner's] chest showed his membership, and the "C" and "W" on his armed showed he belonged to the CBC subset of Cottonwood.  Officer Stratton detailed [Petitioner's] contacts with law enforcement, including his prior arrests, which involved gang-related conduct.  In Officer Stratton's opinion, [Petitioner] was an active membership of the CBC gang on October 12, 2006.

When the prosecutor presented Officer Stratton with a hypothetical of fats nearly identical to those of the shooting in this case, the officer opined that the incident in the hypothetical was gang-related because CBC gang members were gathered, two gang members got into a fight, part of the fight involved respect, and one gang member threatened to have the other forced out of the gang.  Officer Stratton believed the hypothetical crime was committed in association with the CBC gang.  And he believed the crime also benefitted the gang member by enhancing his violation reputation within his own gang, and the gang member's enhanced reputation benefitted the gang as a whole because it informed other gangs that the CBC gang members are capable of violence, even among their own, and that they should be feared.  And if the victim was perceived as a weaker member of the gang, his elimination could potentially benefit the gang as well.  When asked if he thought the hypothetical shooter "just [did] that selfishly," Officer Stratton answered, "No, sir.  I don't think so.  I think when you're talking about–in your hypothetical you talk about running someone from the hood or running them from the gang[,] that has a broader connotation than just himself."  When the prosecutor asked for further explanation, Officer Stratton said, "Well, he's talking about the hood.  He's talking about the gang and a hood.  And a gang by its very definition is more than one person.  So I think he's talking about it being bigger than just his–for his selfish purposes."

**Defense Evidence**

Acoy Bohannon was present when Brownbey was shot.  Bohannon arrived at the house with Brownbey around 7:00 or 8:00 p.m.  Bohannon had seen the seven or eight men before, but he did not really know them.  He did not see [Petitioner] there.  He joined in the dice game and

was drinking with the others.  Everyone was African-American except for the person "that came up shooting."  Bohannon got a good look at the shooter and observed that he was a "Hispanic male with a light goatee, maybe 25 years old, and he had a hoodie sweatshirt with his hoodie on with the hood over his head."  The Hispanic man walked up and asked Brownbey something to the effect of "Give me the money," and then started shooting.  Everyone scattered and ran away.  Bohannon jumped a gate and a fence, then ran a block down the street.  He returned and helped Brownbey, staying with him until the police came.  At that point, he took off because he was on parole.  He did not speak to law enforcement.

On cross-examination, Bohannon testified that each time he had been booked in the Kern County Jail, he had asked to be housed with Crips.  He was not a gang member, but he was more comfortable being housed with Crips.  He was not a gang member, but he was more comfortable being housed with Crips.  He did not think he had ever been specific about which gang, such as the CBC gang.  He had been convicted of felonies and he was currently on parole.  When shown a field interview card, Bohannon did not remember being contacted by police in that area.

Bohannon explained that he watched the Hispanic shooter "just walk[] up casual."  There were men coming and going, so Bohannon did not suspect anything.  The shooter had his hands inside his sweatshirt.  When he approached, Brownbey was kneeling down and shooting dice.  The shooter pulled a chrome gun out of his sweatshirt and started shooting.  He fired two or four shots.  Bohannon left, stood by his car for about 30 seconds, and watched everyone run away.  He returned to see what had happened and he found Brownbey lying on the ground, bleeding.  There was an older man, maybe 40 years old, with Brownbey.  Bohannon stayed for three to five minutes. [Petitioner] was never present that evening.  Bohannon did not know [Petitioner] personally, but he knew him by appearance.  Bohannon knew Collins, but Collins was not the man who stayed with Brownbey.

Bobby Collins testified he had gone to high school with [Petitioner], and he had known Brownbey for seven or eight years.  Collins was present when Brownbey was shot.  Collins and Brownbey were roommates at the time.  Collins arrived at the Southgate house around 5:00 or 6:00 p.m.  While Collins was on his knees gambling, he heard someone from the side say, "[Brownbey], you owe me some money," or something to that effect.  When Collins looked up, he saw a big, dark revolver pointed at Brownbey.  The shooter was a Hispanic man with a goatee.  His hood covered half of his head.  Collins testified he was sure the man was Hispanic, but he could have been some other race.  Collins had never seen the man before.  Before Brownbey could stand up, the man fired two or three shots.  Collins took off running.  He jumped the gate and ran down the street.  He did not return and he never spoke to law enforcement.

On cross-examination, Collins testified that he had never been a CBC member, had never admitted being one, and did not hang out with them.  But he had lived inside CBC territory and had gone to school with a lot of CBC members.  Law enforcement always labeled him a CBC member because he lived in that territory, but he had never been in a gang.  His drug selling had nothing to do with the gang.  In 2007, he suffered a gunshot wound in CBC territory.  Collins had been convicted of a felony for selling cocaine and he was currently on probation.

Collins denied ever having a conversation with Officer Pratta about the shooting.  Collins would not have forgotten the conversation.  When asked which CBC members were present the night of the shooting, Collins answered, "No one."

Darius Key testified that he had known [Petitioner] since they were children.  Key also knew Brownbey from growing up together and from gambling.  On the night of the shooting, Key arrived at the Southgate house at around 4:00 pm.  The crowd remained the same; people did not really come and go.  The men playing dice were all African-American, but three Hispanic people were watching them over the fence.  Southgate was a Hispanic area.  When it got dark, someone wearing a hooded sweatshirt and carrying a gun approached and said something about some money.  The man was a tall, "like white-skinned guy, like you [k]now brown-skinned, like he could be Hispanic."  Key did not get a good look at the man, but he saw "a Hispanic face."  Key immediately started running and jumped the gate.  Everyone ran, but Brownbey was handicapped from a previous shooting.  Once out of the yard, Key heard gunshots.

On cross-examination, Key testified that he had never been a CBC member.  Key explained that when the shooter approached, he peeked and watched the men gambling.  Then he went down and crept up with the gun.  Key testified: "Whoever the person was, he have to be watching us.  SO as he is watching us, he popped up kind of like a movie, kind of like how the police officers do when they trying to stake you out.  They watch you.  And it was a reaction, like–you know what I mean?  I guess at the time, I don't know what he was doing or how he did it.  It seemed like he didn't want to make sure–he probably didn't think if there was a gun in there or not.  Whoever it was, he probably was scared, too."  When the shooter jumped around and Key saw him, he was already pointing the gun and charging at them, saying, "Where the money at? Where the money at?"  Brownbey had a wad of money because he was a good gambler and he was winning that night.  Key explained what he did when he saw the gun: "First thing you are going to do is run.  Like, I didn't try to sit to watch or nothing.  All I saw was this bright skin, and I'm gone."  Key looked at the shooter for about two seconds.  Key did not return and he never spoke to law enforcement.

**Rebuttal Evidence**

Deputy Pratt testified that in November 2008, he contacted Collins's family and left his card.  On November 21, 2008, Collins called Deputy Pratt at work and identified himself.  Deputy Pratt recorded their conversation, which was played for the jury.

In the recorded interview, Collins stated he was not present at the shooting.  When someone called and told him that Brownbey had been shot, he came immediately and stayed with Brownbey when he was down on the ground.  When Collins arrived, only one person, named "Cadillac," was there with Brownbey.  Collins referred to Brownbey as his cousin.  Collins told Deputy Pratt he would tell him who shot Brownbey if he knew.  He said people were being confidential about it so they must be afraid to tell.  When Deputy Pratt told Collins that [Petitioner] shot Brownbey, Collins was surprised because [Petitioner] and Brownbey were so close.

1
2
3
4

Officer Stratton testified that he had researched Bohannon, but had not met him personally.  In Officer Stratton's opinion, Bohannon was at least an associate of the CBC gang.  He had been contacted in September 2003 within CBC territory and he admitted to the officer that was a CBC member.  In addition, on each of his 25 arrests between 1996 and 2006, Bohannon had claimed to be a Crip and asked to be housed with Crips.  On nine of those arrests, he specifically claimed to be a CBC member.

5

(LD[3] 4, Opinion at 3-17.)

6

### III.

7

### DISCUSSION

8

**A.    Jurisdiction**

9

10

11

12

13

14

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution.  The challenged conviction arises out of the Kern County Superior Court, which is located within the jurisdiction of this Court.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).

15

16

17

18

19

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320, 327 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

20

**B.    Standard of Review**

21

22

23

Where a petitioner files his federal habeas petition after the effective date of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), he can prevail only if he can show that the state court's adjudication of his claim:

24

25

26

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

27

28

---

[3] "LD" refers to the Lodged Documents submitted by Respondent on April 5, 2013.

28 U.S.C. § 2254(d). "Federal habeas relief may not be granted for claims subject to § 2254(d) unless it is shown that the earlier state court's decision "was contrary to" federal law then clearly established in the holdings of [the Supreme] Court." Harrington v. Richter, __ U.S. __, 131 S.Ct. 770, 785 (2011) (citing 28 U.S.C. § 2254(d)(1) and Williams v. Taylor, 539 U.S. 362, 412 (2000)). Habeas relief is also available if the state court's decision "involved an unreasonable application" of clearly established federal law, or "was based on an unreasonable determination of the facts" in light of the record before the state court. Richter, 131 S.Ct. 785 (citing 28 U.S.C. § 2254(d)(1), (d)(2)). "[C]learly established ... as determined by" the Supreme Court "refers to the holdings, as opposed to the dicta, of th[at] Court's decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. at 412. Therefore, a "specific" legal rule may not be inferred from Supreme Court precedent, merely because such rule might be logical given that precedent. Rather, the Supreme Court case itself must have "squarely" established that specific legal rule. Richter, 131 S.Ct. at 786; Knowles v. Mirzayance, __ U.S. __, 129 S.Ct. 1411, 1419 (2009). Moreover, the Supreme Court itself must have applied the specific legal rule to the "context" in which the Petitioner's claim falls. Premo v. Moore, __ U.S. __, 131 S.Ct. 733, 737 (2011). Under § 2254(d)(1), review is limited to the record that was before the state court adjudicated the claim on the merits. Cullen v. Pinholster, __ U.S. __, 131 S.Ct. 1388, 1398 (2011). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Richter, 131 S.Ct. at 786.

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003). Both subsections (d)(2) and (e)(1) of § 2254 apply to findings of historical or pure fact, not mixed questions of fact and law. See Lambert v. Blodgett, 393 F.3d 943, 976-77 (2004).

Courts further review the last reasoned state court opinion. See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991). However, "[w]here a state court's decision is unaccompanied by an explanation, the

habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." <u>Richter</u>, 131 S.Ct. at 784.

**C.    Review of Petition**

1.    <u>Insufficient Evidence to Support Gang Enhancement</u>

Petitioner contends there was insufficient evidence to support the jury's finding that the crimes were committed for the benefit of, at the direct of, or in association with a street gang, and there was no evidence to find he had the specific intent to promote, further or assist criminal conduct by gang members.

The California Court of Appeal denied Petitioner's claim in the last reasoned decision stating the following:

> The substantial evidence standard of review applies to gang enhancements and gang participation convictions.  (<u>People v. Martinez</u> (2008) 158 Cal.App.4th 1324, 1329.)  "Our review of the sufficiency of the evidence is deferential.  We review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the [Petitioner] guilty beyond a reasonable doubt.  [Citations.]  We focus on the whole record, not isolated bits of evidence.  [Citation.]  We presume the existence of every fact the trier of fact could reasonably deduce from the evidence that supports the verdict.  [Citation.]  if the verdict is supported by substantial evidence, we accord due deference to the verdict and will not substitute our evaluations of the witnesses' credibility for that of the trier of fact.  [Citation.]"  (<u>People v. Killebrew</u> (2002) 103 Cal.App.4th 644, 660; <u>In re Frank S.</u> (2006) 141 Cal.App.4th 1192, 1196.)  Substantial evidence includes circumstantial evidence and the reasonable inferences this evidence allows.  (<u>People v. Rodriguez</u> (1999) 20 Cal.4th 1, 11; <u>People v. Ferraez</u> (2003) 112 Cal.App.4th 925, 930.)  "We may reverse for lack of substantial evidence only if "'upon no hypothesis whatever is there sufficient substantial evidence to support'" the conviction or the enhancement.  [Citation.]"  (<u>People v. Garcia</u> (2007) 153 Cal.App.4th 1499, 1508.)
>
> To establish a gang enhancement, the prosecution must prove two elements: (1) that the crime was "committed for the benefit of, at the direction of, or in association with any criminal street gang," and (2) that the defendant had "the specific intent to promote, further, or assist in any criminal conduct by gang members …."  (§ 186.22(b)(1).)  [FN4]  The crime must be "gang related."  (<u>People v. Gardeley</u>, <u>supra</u>, 14 Cal.4th at pp. 622, 625, fn. 12; <u>People v. Albillar</u> (2010) 51 Cal.4th 47, 60; <u>People v. Castaneda</u> (2000) 23 Cal.4th 743, 745 [gang enhancement statute "increases the punishment for some gang-related crimes"]; <u>People v. Mendez</u> (2010) 188 Cal.App.4th 47, 56 [gang enhancement statute "applies when a crime is gang related"].)  "Not every crime committed by gang members is related to a gang."  (<u>People v. Albillar</u>, <u>supra</u>, at p. 60.)  A defendant's mere membership in the gang does not suffice to establish the gang enhancement.  (<u>People v. Gardeley</u>, <u>supra</u>, at pp. 623-624; In re Frank S., <u>supra</u>, 141

Cal.App.4th at p. 1199; accord People v. Martinez (2004) 116 Cal.App.4th 753, 762 [section 186.30 context].)

FN4. The prosecution must also prove "that the gang (1) is an ongoing association of three or more persons with a common name or common identifying sign or symbol; (2) has as one of its primary activities the commission of one or more of the criminal acts enumerated in the statute; and (3) includes members who either individually or collectively have engaged in a 'pattern of criminal gang activity' by committing, attempting to commit, or soliciting two or more of the enumerated offenses (the so-called 'predicate offenses') during the statutorily defined period." (People v. Gardeley (1996) 14 Cal.4th 605, 617, italics omitted.) [Petitioner] does not challenge the evidence concerning these elements, and thus implicitly concedes the sufficiency of the evidence supporting them.

"[T]o prove the elements of the criminal street gang enhancement, the prosecution may, as in this case, present expert testimony on criminal street gangs. [Citation.]" (People v. Hernandez (2004) 33 Cal.4th 1040, 1047-1048 (Hernandez); People v. Ferraez, supra, 112 Cal.App.4th at p. 930 ["It is well settled that expert testimony about gang culture and habits is the type of evidence a jury may rely on to reach a . . . finding on a gang allegation"].) "'Generally, an expert may render opinion testimony on the basis of facts given "in a hypothetical question that asks the expert to assume their truth." [Citation.] Such a hypothetical question must be rooted in facts shown by the evidence, however. [Citations.]' [Citation.]" (People v. Ward (2005) 36 Cal.4th 186, 209.) But "[a] gang expert's testimony alone is insufficient to find an offense gang related." (People v. Ochoa (2009) 179 Cal.App.4th 650, 657.) Rather, the expert testimony must be accompanied by some substantive factual evidentiary basis from which the jury could reasonably infer the crime was gang related. (Id. at p. 660 ["something more than an expert witness's unsubstantiated opinion that a crime was committed for the benefit of, at the direction of, or in association with any criminal street gang is required to justify a true finding on a gang enhancement"]; People v. Ramon (2009) 175 Cal.App.4th 843, 852; People v. Morales (2003) 112 Cal.App.4th 1176, 1198; People v. Ferraez, supra, at p. 931.)

**A. First Element**

As we have explained, the first element of the gang enhancement may be satisfied by any one of three prongs—the crime was committed for the benefit of, at the direction of, or in association with a criminal street gang. (§ 186.22, subd. (b)(1).) In this case, sufficient evidence supported two of the three prongs.

There was evidence to support the finding that the shooting was committed for the benefit of the CPC gang. The gang expert testified that such a crime would enhance the violent reputation of not only the gang member who did the shooting, but the gang as a whole. Other gangs would know that CBC members were to be respected and feared because of what they were capable of doing. The reputation of active CBC members, as Jackson explained, is based on unlimited aggressiveness. That reputation skyrockets when a member shows fearlessness and a willingness to kill.

There was also ample evidence that the shooting was committed in association with the CBC gang. Association with the gang requires more than association with a gang member; it

requires evidence that the crime was gang related.  (People v. Gardeley, supra, 14 Cal.4th at p. 622; In re Frank S., supra, 141 Cal.App.4th at p. 1199.)  As the gang expert testified, the shooting was gang related and committed in association with the gang because it occurred at a gang gathering, two gang members got into a fight, the fight involved disrespect, and one gang member threatened to have the other forced out of the gang.  [Petitioner's] claim that the shooting was not gang related, but just happened to occur between two fellow gang members, is completely contradicted by the evidence, which established that the motivation for the crime was gang related.  Other witnesses testified that the argument started with disrespectful comments, which were particularly egregious because they were spoken in the presence of a group of fellow gang members.  [Petitioner] told Brownbey that the ran "this out here," and they argued about their status in the gang.  The argument escalated until [Petitioner] threatened to run Brownbey out of the gang—a comment so serious and disrespectful that it drove Brownbey to strike [Petitioner].  When Brownbey prevailed in the ensuing physical fight, [Petitioner] swore he would shoot Brownbey and he left for a gun.

Jackson explained that reputation and respect are very important in a gang, particularly for a gang member's status within the gang.  Indeed, a prospective gang member who, through family contacts, is eligible to simply join the gang might instead choose the physical abuse of getting "jumped in" because it immediately elevates his reputation.  If a gang member is run out of the gang or hood, his life is threatened and he will be killed if he remains in the neighborhood.  He can never return.  A threat to run someone out of the gang is a very serious and disrespectful comment.

Based on this evidence, it is clear the shooting was motivated by a struggle for power and respect within the gang, and by the desire to enhance [Petitioner's] notoriety for violence and fearlessness.  In other words, the crime was intimately related to the activities of the gang.

**B. Second Element**

[Petitioner] also maintains that the gang expert's testimony that the shooting was not for [Petitioner's] selfish purposes, which [Petitioner] claims was the sole evidence presented on the issue, did not constitute substantial evidence of the second element—that [Petitioner] acted with "the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ."  (§ 186.22, subd. (b)(1).)

The mental element of the gang enhancement requires substantial evidence from which the jury can infer that in committing the gang-related criminal act, defendant specifically intended to engage in or promote criminal gang conduct.  (People v. Albillar, supra, 51 Cal.4th at p. 68.)  A finding of specific intent requires a subjective desire.  (See 1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Elements, § 5, p. 204.)  However, "[i]ntent is rarely susceptible of direct proof and usually must be inferred from the facts and circumstances surrounding the offense."  (People v. Pre (2004) 117 Cal.App.4th 413, 420.)

"There is no requirement in section 186.22, subdivision (b), that the defendant's intent to enable or promote criminal endeavors by gang members must relate to criminal activity apart from the offense defendant commit.  To the contrary, the specific intent required by the statute is 'to promote, further, or assist in any criminal conduct by gang members.'  [Citation.]

Therefore, defendant's own criminal [act] qualifie[s] as the gang-related criminal activity. . . . [T]here is no requirement in section 186.22 that the crime be committed with the intent to enable or further any other crime. . . ." (People v. Hill (2006) 142 Cal.App.4th 770, 774.)  This is not to say, however, that a gang member's intent to merely commit the crime—that is, to promote his own criminal act—suffices to establish the specific intent required by the statute. But when the circumstances surrounding the crime establish that the crime itself was related to the activities of the gang, an inference of specific intent to promote criminal conduct by gang members reasonably may be drawn.  (See In re Frank S., supra, 141 Cal.App.4th at p. 1199.)

Here, there was evidence that the circumstances of the shooting were rooted in the gang culture of respect, power, and reputation.  The gang expert opined that a threat to run a gang member from the gang or the hood has a broad, gang-related meaning, and therefore the hypothetical shooting was not simply a selfish crime.   Abundant evidence established the critical importance of respect in the gang, and the gang members' aspiration to gain a reputation for aggression, violence, and fearlessness.  [Petitioner] and Brownbey were engaged in a power struggle over their positions and reputations within the gang.  They exchanged words of disrespect, argued about who was running things and who had the "stripes," and [Petitioner] ultimately threatened to force Brownbey out of the gang.  In our opinion, a reasonable jury could infer from the circumstances of the crime and the customs and priorities of the gang that [Petitioner] intended his shooting of a disrespectful fellow gang member to have the effect of elevating and expanding his reputation as an aggressive and violent member, thus facilitating future crimes committed by [Petitioner] and his fellow gang members.  Sufficient evidence supported the mental element of the gang enforcement.

(LD 4 at 17-22.)

The law on insufficiency of the evidence claim is clearly established.  The United States Supreme Court has held that when reviewing an insufficiency of the evidence claim on habeas, a federal court must determine whether, viewing the evidence and the inferences to be drawn from it in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319 (1979).  Sufficiency claims are judged by the elements defined by state law.  Id. at 324, n. 16.  Under AEDPA, a petitioner must show that the state court was objectively unreasonable when if found sufficient evidence. Because the sufficiency of the evidence standard enunciated in Jackson "is exceedingly general," federal courts must give a state court merits adjudication of a Jackson sufficiency-of-the-evidence claim "considerable leeway."  Davis v. Lafler, 658 F.3d 525, 535 (6th Cir. 2011 (en banc) (citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).  Therefore, when the deferential standard set forth in AEDPA is combined with the already-onerous Jackson standard, the petitioner's burden is

16

exceptionally difficult to carry.  Indeed, the Ninth Circuit has stated when assessing a sufficiency of the evidence challenge by way of federal habeas corpus subject to the strictures of AEDPA,

> there is a double dose of deference that can rarely be surmounted.  The <u>Jackson v. Virginia</u> standard is itself deferential, as it only permits relief when "no rational trier of fact" could have found the elements necessary for guilt satisfied beyond a reasonable doubt.  <u>Jackson</u>, 443 U.S. at 324, 99 S.Ct. 2781.  AEDPA adds a second level of deference, as it is not enough if we conclude that we would have found the evidence insufficient or that we think the state court made a mistake.  Rather, the state court's application of the Jackson standard must be "objectively unreasonable" to warrant habeas relief for a state prisoner.  Stated another way, to grant relief, we must conclude that the state court's determination that a rational jury could have found that there was sufficient evidence of guilt, i.e., that each required elements was proven beyond a reasonable doubt, was objectively unreasonable.

<u>Boyer v. Belleque</u>, 659 F.3d 957, 964-965 (9th Cir. 2011).

Contrary to Petitioner's argument, the jury's finding that Petitioner's actions were done to benefit the gang and with the specific intent to further the criminal activity of the gang, is supported by sufficient evidence.  Here, the evidence showed that both Petitioner and the victim were members of the Country Boy Crips gang and reputation was very important to both of them as members of the gang.  Petitioner had disrespected the victim by telling him that he was going to "run him out of the gang."  The assault was carried out shortly after Petitioner had "disrespected" the victim and occurred in the presence of other gang members.  Based on the evidence in this case, reasonable inferences could be drawn that the shooting by Petitioner was done in order to gain rank or status and could depict him as a respected member of the gang by engaging in violence.

Furthermore, the appellate court made specific reference to Officer Stratton's testimony regarding respect and reputation among the gang members to support the jury's true finding on the gang enhancement.  Officer Stratton testified the assault increased Petitioner's respect, which in turn increased the Country Boy Crips' reputation.  (RT 670-676.)  If Brownbey was perceived as a weak member of the gang, the gang would benefit from eliminating him.  (<u>Id.</u>)  The dispute initiated with insults to Brownbey's girlfriend and escalated to the point of Petitioner threatening to "run him out of the gang" causing Brownbey to hit Petitioner in the face.  (RT 182-184.)  The threat took place in front of other gang members and Brownbey believed Petitioner would "run" him out of the gang by any means necessary.  (<u>Id.</u>)  In light of this testimony, a rational jury could conclude that the shooting by

17

Petitioner increased the Country Boy Crips' reputation by demonstrating that he is willing to engage in violence even among fellow gang members to further the objectives of the gang.  Thus, it was reasonable for the jury to infer that Petitioner committed the assault on Brownbey to benefit the Country Boy Crips gang, to intimidate and instill fear in people within its territory, and to enhance or maintain its reputation.  People v. Pre, 117 Cal.App.4th 413, 420 (2004) ("Intent is rarely susceptible of direct proof and usually must be inferred from the facts and circumstances surrounding the offense.").

Although the jury could have concluded that the assault was the result of a personal dispute regarding their respective girlfriends, it was not required to make such finding.  As explained above, the jury could reasonably conclude that the violent assault was gang-related and was committed to enhance the reputation of Petitioner and the Country Boy gang.  Petitioner's claim that the attack was done for personal reasons and not to benefit the gang, is merely his version of the incident and interpretation of the evidence.  However, in federal habeas corpus review, when confronted with a factual record "that supports conflicting inferences must presume … that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  Jackson, 443 U.S. at 326.  Accordingly, based on the record in this case, there was sufficient evidence from which the jury could reasonably infer that the assault was committed with the specific intent to promote or further the criminal street gang.

2.      Violation of Due Process Based on Delay in Prosecution

Petitioner contends the prosecution violated his speedy trial and due process rights by filing a complaint against him over two years after dismissing a prior similar complaint.

In the last reasoned decision, the California Court of Appeal found the claim to be without merit reasoning as follows:

> [Petitioner] asserts that his due process right to a speedy trial was violated because the prosecution refiled a complaint more than two years after the first complaint was dismissed. According to the parties' papers, the first complaint was filed on October 23, 2006, and the case was dismissed on November 3, 2006, prior to the preliminary hearing.  Over two years later, on November 21, 2008, the prosecution refiled the charges against [Petitioner].  We find no error here.

"[T]he Speedy Trial Clause has no application after the Government, acting in good faith, formally drops charges.  Any undue delay after charges are dismissed, like any delay before charges are filed, must be scrutinized under the Due Process Clause, not the Speedy Trial Clause."  (United States v. MacDonald (1982) 456 U.S. 1, 7, fn. omitted.)  "Delay in prosecution that occurs before the accused is arrested or the complaint is filed may constitute a denial of the right to a fair trial and to due process of law under the state and federal Constitutions.  A defendant seeking to dismiss a charge on this ground must demonstrate prejudice arising from the delay.  The prosecution may offer justification for the delay, and the court considering a motion to dismiss balances the harm to the defendant against the justification for the delay.  [Citations.]  A claim based upon the federal Constitution also requires a showing that the delay was undertaken to gain a tactical advantage over the defendant.  [Citations.]  '[P]rejudice may be shown by loss of material witnesses due to lapse of time [citation] or loss of evidence because of fading memory attributable to the delay.'  [Citation.]"  (People v. Catlin (2001) 26 cal.4th 81, 107.)

"Prosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt. . . . A prosecutor abides by elementary standards of fair play and decency by refusing to seek indictments until he or she is completely satisfied the defendant should be prosecuted and the office of the prosecutor will be able to promptly establish guilt beyond a reasonable doubt."  (People v. Dunn-Gonzalez (1996) 47 Cal.App.4th 899, 0914-915.)

In this case, we agree with the trial court that [Petitioner] failed to show that he was prejudiced by the delay or that the prosecution intentionally delayed to gain a tactical advantage.  Brownbey had initially identified [Petitioner] as the shooter, but he had refused to give a statement or testify.  There was simply not enough evidence to proceed with the trial until Brownbey agreed to testify.  The additional witnesses, Jackson and Johnson, located during the delay were, as the prosecutor puts it, bonuses.  [Petitioner] did not show that he lost witnesses or the memories of witnesses.  In fact, he presented a good defense with witnesses who testified that he was not the shooter.  Substantial evidence supported the trial court's findings and therefore the trial court did not err in denying [Petitioner's] motion to dismiss.  (People v. Dunn-Gonzalez, supra, 47 Cal.App.4th at pp. 911-912 [whether delay was unreasonable and prejudicial is a question of fact; we uphold the trial court's ruling on motion to dismiss if supported by substantial evidence].)

(LD 4 at 25-26.)

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial."  U.S. Const. amend. VI.; Klopfer v. North Carolina, 386 U.S. 213, 223 (1967).  "The speedy trial guarantee is designed to minimize the possibility of lengthy incarceration prior to trial, to reduce the lesser, but nevertheless substantial, impairment of liberty imposed on an accused while released on bail, and to shorten the disruption of life caused by arrest and presence of unresolved criminal charges."  United States v. MacDonald, 456 U.S. 1, 8 (1982).  The right to a speedy trial applies only

to post-indictment delay because "only 'a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge . . . engage the particular protections' of that provision." United States v. Lovasco, 431 U.S. 783, 788-789 (1977).  Thus, the speedy trial guarantee "is activated only when a prosecution has begun and extends only to those persons who have been 'accused' in the course of that prosecution." United States v. Marion, 404 U.S. 307, 313 (1971).  Although delay prior to arrest or indictment may raise a due process claim under the Fifth Amendment, there is no Sixth Amendment right to a speedy trial arises until charges are pending. MacDonald, 456 U.S. at 7.  "Similarly, the Speedy Trial Clause has no application after the Government, acting in good faith, formally drops charges.  Any undue delay after charges are dismissed, like any delay before charges are filed, must be scrutinized under the Due Process Clause, not the Speedy Trial Clause." Id.; see also Marion, 404 U.S. at 321, 323-324.

Under clearly established federal law, in order to demonstrate a violation of due process based on pre-indictment delay, Petitioner must carry a heavy burden by proving actual, non-speculative prejudice to his defense from the delay. United States v. Huntley, 976 F.2d 1287, 1290 (9th Cir. 1992) (citing United States v. Lovasco, 431 U.S. at 790.  If actual prejudice is shown, the Court must then balance the length of the delay against the government's reason for the delay to determine if the delay "violates those 'fundamental conceptions of justice which lie at the base of our civil and political institutions,' which define 'the community's sense of fair play and decency.'" Lovasco, 431 U.S. at 790 (citations omitted).

Although a prosecutor may not delay prosecution for tactical reasons, the prosecution is entitled to an "investigative delay" and filing charges need not be brought "until [the prosecution] is completely satisfied that [it] should prosecute and will be able promptly to establish guilt beyond a reasonable doubt." Id. at 795.

As stated by the state appellate court, the initial complaint was filed on October 23, 2006, and the case was dismissed on November 3, 2006, prior to the preliminary hearing after the victim, Brownbey, refused to testify.  Brownbey had previously identified Petitioner as the shooter, but he refused to give a statement or testify.   The prosecution indicated that without Brownbey's testimony

20

1    there was not enough evidence to proceed.  (RT 1648.)  Brownbey agreed to testify two years later and

2    the prosecution refiled the charges against Petitioner.

3         Petitioner argues that the prejudice from the delay did not result in the loss of defense

4    witnesses or impairment of their memories, but rather the prosecution locating witnesses and gaining

5    evidence during the delay.  In this instance, the state appellate court reasonably determined that there

6    was a legitimate ongoing investigation and it was not until Brownbey agreed to give a statement and

7    testify at trial that charges could legitimately be brought.  There is no showing that the prosecution

8    delayed refiling charges to gain a tactical advantage.  It was Brownbey and Jackson's willingness to

9    testify that prompted the refiling.  Petitioner points to no evidence to demonstrate the prosecution

10   engaged in behavior to gain an advantage to the detriment of his defense.  Nor has Petitioner pointed

11   to prejudice as he did not lose any evidence or witnesses, and there is no evidence any delay was

12   deliberate.  Indeed, Petitioner acknowledges that the prosecution interviewed Brownbey three times

13   while he was in custody on unrelated charges and each time he expressed unwillingness to testify

14   against Petitioner.  Instead, he insisted he would handle it on the streets.  These facts negate

15   Petitioner's bare assertion that the delay was for tactical advantage resulting in prejudice.  On

16   November 21, 2008, charges were promptly filed after Brownbey indicated his willingness to testify

17   against Petitioner on October 22, 2008, and any claim the prosecution delayed refiling based on the

18   conclusion of Brownbey's unrelated conviction is unfounded.  (RT 1648-1649, 1652-1652; CT 1,

19   172.)  New evidence is not a tactical advantage.  See e.g., Burns v. Lafler, 328 F.Supp.2d 711, 720 (E.

20   D. Mich. 2004) ("Intentional delay for the purpose of gaining tactical advantage . . . [does] not include

21   delay to affirmatively strengthen the government's case—such as delay until a potential witness

22   becomes available by reason of a plea bargain or the like." (quoting United States v. Crouch, 84 F.3d

23   1497, 1514, n.23 (5th Cir. 1996).  Moreover, there is simply no evidence that the prosecution delayed

24   in anticipation that Brownbey or Jackson would testify.

25   ///

26   ///

27   ///

28   ///

**IV.**

**RECOMMENDATION**

Based on the foregoing,

IT IS HEREBY RECOMMENDED that:

1.      The instant petition for writ of habeas corpus be DENIED; and

2.      The Clerk of Court be directed to enter judgment in favor of Respondent.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and filed within fourteen (14) days after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).


IT IS SO ORDERED.

Dated:   **June 3, 2013**                     _____

UNITED STATES MAGISTRATE JUDGE